IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

FILED

2004 MAR 25  A 11: 28

U.S. DISTRICT COURT
BRIDGEPORT, CONN

| | | |
|---|---|---|
| EDWARD W. ORR | : | |
|      Plaintiff | : | Civil Action |
| vs. | : | No. 302 CV 1457 (SRU) |
| | : | |
| RELIANCE STANDARD | : | |
| LIFE INSURANCE COMPANY | : | March 24, 2004 |
|      Defendant | : | |

## MOTION FOR PERMANENT INJUNCTIVE RELIEF

The Plaintiff, Edward W. Orr, hereby moves this Court for permanent injunctive relief under The Employee Retirement and Security Act of 1974 (ERISA) 29 USC 81001 et seq. and states as follows:

1.     Mr. Orr suffers from Spinal Cord Dysesthesic and Dysreflexic Syndromes (Exhibit B; Exhibit R; RSL 28-30, 44-46; et al).  DDS is a rare disorder.  See, i.e., Watts v. Organogenesis, 30 F.Supp.2d 101, 107 (D. Mass. 1998) [an ERISA case involving the handling and treatment of a patient with DDS, wherein the Court noted, "Demonstrating how serious Watts' condition is, Dr. Bergman recounted [a life-threatening] attack **precipitated during a routine medical visit by the doctor's simple movement of Watts' arm** – an attack Dr. Bergman relayed as unnerving even to someone with her level of experience and expertise."] (Emphasis and underlining supplied)

The Court then went on to describe how Watts' body would respond abnormally to almost any stimulus:

1

Dysreflexia is an abnormal response to a problem or stimulus in the body below the point of an SCI. The condition is most likely to occur if an SCI is at or above the 6th thoracic vertebra, which Watts' injury is [and so are approximately half of Orr's injuries,[1] as shown in Exhibit B; Exhibit R; RSL 28-30, 44-46; et al). **In layperson's terms...dysreflexia occurs when there is a stimulus [even a light touch] to the body below the level of the injury and the intended message cannot get to the brain through the normal route because it is interrupted by the injury.** (Id., at 103) (Emphasis supplied)]

2.    Accordingly, the Plaintiff, Edward W. Orr, respectfully moves this Court to grant permanent injunctive relief,[2] as supported by multiple physicians who have documented the threat of irreparable harm. More specifically stated:

A.    "Multiple diagnoses and/or conditions exist, and there exists the threat of irreparable harm from tests, examinations, interviews, rehabilitative employment, etc."

---

[1] The "multiplicity" of Orr's injuries (and/or the manifold testing thereof) has been overtly commented upon by numerous physicians, and is duly noted, for instance, in Exhibits B; R; N-Q; J; V; RSL 28-30; RSL 44-46; RSL 23-24; RSL 39-40; et al. Of course, the existence of so many simultaneous injuries is – in and of itself – a rare occurrence, and also one which provokes a plethora of abnormal responses, as shown in many of the aforementioned references.

[2] The Plaintiff attaches a Memorandum of Law, and moves pursuant to Rule 65, Federal Rules of Civil Procedure, and also pursuant to the Employee Retirement and Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. including § 1132 (a) (3) (B), also referred to as "ERISA § 502 (a) (3)," and other designations. The latter section provides:

A civil action may be brought – (3) by a participant, beneficiary, or fiduciary (a) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (b) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

(Dr. Mary Guerrera, Dr. David Katz,[3] Dr. Adam Perrin, Dr. John Cannon, and Dr. Robban Sica; Exhibits M, N, O, P, and Q)

B.    "No more tests, examinations, interviews, and/or related are to be permitted, as the patient may suffer irreparable harm therefrom." (Id.)

C.    "The patient has already undergone multiple tests, examinations and/or interviews in regard to determining the extent to which he/she was/is/will be disabled, and/or in regard to the extent that he/she can be rehabilitated (past/present/future)." (Id.)

D.    "The patient has spinal cord (SCI) and/or related injuries; and, as a result, his/her condition is fragile." (Id.)

E.    "The patient's health is not to be further jeopardized by any requirements set forth by an insurer and/or by any party acting on behalf of – or in conjunction with – an insurer." (Id.)

F.    "Special circumstances exist, and he/she cannot be expected to gather any more proof now or in the future, except for the proof described in Part # [G] below:" (Id.)

---

[3] Dr. David L. Katz, MD, MPH, FACPM is Associate Clinical Professor of Public Health & Medicine, Director of Medical Studies in Public Health (Yale University School of Medicine), Director of the Yale IMC, and author of *Clinical Epidemiology and Evidence-Based Medicine* and six additional textbooks. His abbreviated qualifications as Yale IMC Director are shown in Exhibit EE; his abbreviated Curriculum Vitae is shown in Exhibit FF; and the cover of his evidence-based medicine textbook (*Clinical Epidemiology and Evidence-Based Medicine*) is shown in Exhibit GG.

G.    "The patient's treatment options are extremely limited.  Therefore, the definition of "under the regular care of a physician" for this patient is as follows:  At least twice per calendar year, unless the patient cannot be safely transported this often.  The patient can obviously receive any medical care he/she deems necessary.  A person designated as having power of attorney for the patient will communicate to the insurer, by certified mail, at least twice per calendar year (unless the patient cannot be transported this often, in which case the person having power of attorney will ask a physician to communicate this fact to the insurer), that the patient received medical care.  One of the individuals having power of attorney is _____Darlene D. Orr,_____ and he/she has also signed below." (Id.)

H.    "The patient is totally and permanently disabled..." (Id.)

## I.    UNIQUE AND EXIGENT CIRCUMSTANCES

3.    This is not a typical disability case.  The Plaintiff is severely disabled, so much so that Dr. Eric Woodard, who has examined the Plaintiff on multiple occasions, and who is a Neurosurgeon and Professor at Harvard University, references eight pages of diagnoses and conditions (Exhibit R) as follows:

1.    *Multiple cervical fractures (C6 and C7)*

2.    *Multiple lumbar fractures (L1, L2, L3, L4)*

3.    Nineteen millimeter (19mm) anterior translation of vertebrae from a 120-mile-per-hour rear-end collision (followed by multiple side-impacts at 55-60 miles per hour).

4.    Spinal cord compression

5.    Multiple impacts to the face, chest, neck and back regions, with some impacts causing bone breakage, and some impacts causing bone dislocation and/or related jaw, neck, face, head, back, hands, arms, leg, feet and other accident-related injuries.

6.    Spinal cord damage in the cervical region

7.    Disc and soft tissue damage (including C1, C2, C3, C4, C5, C6, C7, T1, T2) in the cervical and thoracic region.

8.    Reflex sympathetic dystrophy

9.    Please note that some of the injuries may be motion-sensitive, and/or position-sensitive.

10.    Disturbance of skin sensation in numerous dermatomes

11.    Whiplash

12.    Soft-tissue injuries

13.    Bruises

14.    Crush injuries

15.    Myalgia

16.    Myositis

17.    Ligamentous injuries

18.    Lacerations

19.    Bowel and bladder problems

20.    Abnormal pelvic alignment and motion

21.    Sexual dysfunction

22.    Inability to sit, stand, or ambulate normally

23.    Respiratory problems

24.    Disturbance of sleep

25.    Headaches

26.    Multiple facet arthropathy

27.    Fatigue

28.    Deformation of chest

29.    Muscle atrophy (related to disuse)

30.    Multiple pharmaceutical allergies

31.    Tachycardia

32.    Spinal cord damage in the thoracic and lumbar regions

33.    Disc and soft tissue damage in the thoracic and lumbar regions (including T12, L1, L2, L2, L3, L4, L5, S1-5)

34.    Cauda equina damage

35.    Spinal scar tissue

36.    Osteophytes

37.    Osteoarthritis

38.    Bone fragments in spine

39.    Concussion

40.    Loss of consciousness

41.    Post-concussion syndrome

42.    Amnesia

43.    Facial scarring

44.    Neck scarring

45.    Lacerations

46.    Internal bleeding, including blood in urine

47.    Swelling of the face

48.    Discoloration of the face

49.    Discoloration of the jaw

50.    Motion-induced inflammation and infection of the jaw and face

51.    Disturbance of the voice and of the ability to enunciate, to vocalize, and to be understood

52.    Hematoma

53.    Pericardial effusion

54.    Sternal/rib contusions

55.    Chest injuries, including deformation of the chest

56.    Chondritis

57.    Inflammation of the pericardium

58.    Facet syndrome

59.    Facet asymmetry

60.    Facet arthropathy

61.    Narrowing of the neural foramina

62.    Spondylosis

63.    *Ankylosis*

64.    *Vertebral spurring*

65.    *Loss of normal lordosis*

66.    *Occiput, atlas, and axis compression*

67.    *Forward head shift*

68.    *Spinal shift*

69.    *Hip and pelvic obliquity*

70.    *Piriformis entrapment*

71.    *Piriformis syndrome (in addition to "entrapment")*

72.    *S1 inflammation*

73.    *Spurring in the spine and hips*

74.    *Hypertropic changes in the spinal column*

75.    *Bony bar formation in the spine*

76.    *Bilateral sacroiliitis*

77.    *Elevation of the right iliac crest*

78.    *Joint swelling*

79.    *Extremity swelling*

80.    *Motion-induced discoloration of skin*

81.    *Mottling of skin*

82.    *Muscle spasm*

83.    *Hypesthesia*

84.    *Paresthesia*

85.    *Loss of coordination*

86.  Loss of endurance

87.  Loss of balance

88.  Altered glenohumeral / scapulothoracic rhythm

89.  Limited neck movement

90.  Limited trunk movement

91.  Limited lower extremity movement

92.  Limited upper extremity movement

93.  Lower extremity radiculopathies

94.  Upper extremity radiculopathies

95.  Sciatic entrapment neuropathy

96.  Chemical (injection-related) damage to the sciatic nerve

97.  Mechanical damage to the sciatic nerve

98.  Lesion of the sciatic nerve

99.  Irritation of the dura mater, and of the arachnoid and pia mater of the central nervous system

100.  Meningeal irritation

101.  Stenosis

102.  TMJ dysfunction

103.  Trigeminal nerve damage

104.  Dislocated, rotated, and chipped teeth and dental appliances

105.  Geniculate neuralgia

106.  Myofascial pain syndrome

107.  Facial numbness

108.    Inability to expand chest normally

109.    Severely limited ability to breathe normally

110.    Severely limited ability to speak normally

111.    Difficulty swallowing

112.    Severely limit ability to eat normally

113.    Occlusal splint required ninety-five-plus percent of the time

114.    Limited ability to swallow normally

115.    Hypesthesia

116.    Sensory impairment

117.    Abnormal reflexes

118.    Absent triceps reflex

119.    Absent finger reflex

120.    Absent ankle jerk reflex

121.    Diminished knee jerk reflex

122.    Weakness of iliopsoas

123.    Dorsiflexion weakness

124.    Right-left asymmetry of plantar response

125.    Other asymmetric and/or abnormal reflexes

126.    Reduced motor power

127.    Difficulty with dressing and ADL

128.    Motion-induced cauda equina syndrome

129.    Cauda equina enteritis

130.    Cauda equina hemorrhoids

131.   Altered and decreased motor nerve conduction

132.   Altered and decreased sensory nerve conduction

133.   Trigger point tenderness

134.   Lipoma (CNS)

135.   Nerve compression

136.   Nerve root compression

137.   Soft tissue dysfunction

138.   Degenerative joint disease

139.   Dysesthesia

140.   Compression of the thecal sac

141.   Disc space narrowing

142.   Thecal sac deformity

143.   Disc protrusion

144.   Tear in the posterior central annulus

145.   Relapsing fever

146.   Discogenic, radicular, and vertebral syndromes of the upper and lower extremities

147.   Partial and incomplete bony fusion of numerous vertebrae

Needless to say, Mr. Orr is severely disabled, and Dr. Woodard has documented the following:

"The patient is totally and permanently disabled." (Exhibit B)

"The patient does not have a work capacity and cannot perform the duties of any occupation." (Exhibit B)

Dr. Woodard's abbreviated Curriculum Vitae is shown in Exhibit CC. In addition, please note that the abbreviated Curriculum Vitae of Dr. Peter M. Black, the Neurosurgeon-in-Chief (also of Harvard) who referred Orr to Dr. Woodard, is shown in Exhibit DD (forty-seven pages).

4.    Dr. Mary Guerrera has also documented that the patient is totally and permanently disabled, and that he cannot perform the duties of any occupation. (Exhibit J).

5.    Since October 25, 1995, the date of the accident causing Orr's injuries, Orr has been examined tested, examined, and /or interviewed more than one time, more than a dozen times, and – in fact – more than one thousand times. (Exhibit T, containing 4,200+ pages of medical records.)

6.    Furthermore, since October 25, 1995, Orr has been over-tested, over-examined, and/or over-interviewed so much that as early as April 3, 1996, the first of many physicians began the process of placing restrictions on further testing (Exhibit U, with Dr. Hiliary Onyiuke clearly denoting "<u>NO</u> PASSIVE ROM [Range of Motion]," a restriction that prohibited several dozen tests and test regimes).

7.    The patient's condition was and is fragile, and is now becoming more so with each and every passing day.  Orr's health has already been jeopardized numerous times by "mandated" testing conducted by, and/or recommended by, for instance, healthcare insurance providers, with two independent physicians ([Dr. Mary Guerrera, December 8, 2000, as shown at RSL 31-32; also RSL 47-48] [Dr. Robban Sica, December 7, 2000, as shown in Exhibit C, at Dr. G 223*** – Dr. G 224***]) indicating – *years ago* – that invasive testing had already been completed, and that "further testing [and not limited to the "invasive" type of testing, either] is unnecessary and would be harmful to the patient's health."

8.    The patient's condition subsequently became even more fragile, with three independent physicians protecting the patient from injury and irreparable harm that might arise from having to be transported, and/or having to speak, and/or even having to be present at insurance company documentary and oral proceedings (Dr. Mark Warner, May 1, 2001; Dr. Adam Perrin, April 30, 2001; and Dr. Mary Guerrera, May 1, 2001; Exhibit G).

9.    The patient's condition continued to become more fragile, and on September 6, 2001, Dr. Adam Perrin formally documented the following: "All testing that can be done has been completed..." (Exhibit V).[4]

---

[4] It is almost ridiculous and certainly unfortunate that three independent physicians have also had to point out that Orr's present condition (in which his health is threatened by **too much** "treatment") is largely a direct result of his having received **too little** treatment, of the appropriate type, in the critical months following the accident.

13

10. It is also notable that approximately one year prior to the date in Paragraph 18, it had become necessary for the patient's wife to assume Power of Attorney (Exhibit W, October 20, 2000; Please note that even as early as 1995, the patient's wife had had to sporadically assume Power of Attorney, with matters gradually progressing to the point where, in the year 2000, she was required to assume POA in nearly all matters.)

---

(The three independent physicians are as follows: Dr. Mark LoDico, with documentation thereof at RSL 21, 37, 216; Dr. Mark Warner at RSL 22, 38; and Dr. Adam Perrin at Exhibit I and Exhibit V.)

The above is, for a variety of reasons, quite germane to the issue at hand. First of all, too little treatment of the "appropriate" type is also related to describing precisely why Orr is in the shape he is in today. In its previously submitted briefs, Reliance has more than once expressed consternation, amazement and/or disbelief that Orr's condition could have declined after he returned to work sporadically. And now we see that three independent physicians had gone to the trouble of documenting why Orr's state had become more fragile over time. Furthermore, if Reliance had even bothered to read the stripped-down claim file (paying particular attention to Dr. LoDico at RSL 21, 37, 216; and Dr. Mark Warner at RSL 22, 38), then Reliance would known what was going on.

The issue of Orr's gradual decline is also germane to any discussion of "harmful tests, exams, interviews, etc." For instance, please see Exhibit U, from 1996, where a physician discovered – and documented – that prohibited (and potentially harmful) testing had been employed. This abuse of testing – and the documentation thereof – was entered into the medical record eight years ago, and further accentuates the fact that Orr's current state of fragility in the year 2004 is certainly not a new thing. It's been a gradual process, and it's been a long time coming.

For instance, in regard to Exhibit U, please refer to Line #4 of the "CURRENT STATUS" section, where an abbreviation ("PROM") for "Passive Range of Motion" appears. Ms. Susan Sullivan, the physical therapist, made this notation, and furthermore noted "Full PROM," confirming that she had physically grasped the limb and/or "appendage" (which can include the head, neck, trunk, etc.), and had guided and/or forced it through the entire range of motion.

Unfortunately, this was a contraindicated maneuver in a patient with six broken bones in his spine, two in his neck, and four in his back; therefore, in the "PHYSICIAN'S COMMENTS" section near the bottom of the page, the neurosurgeon wrote "EXCEPT NO PASSIVE ROM." (In fact, Orr's neurosurgeon had repeatedly cautioned him that no such maneuvers were allowed.)

11.    No amount of money damages can compensate Orr for the threat of irreparable harm from tests, examinations, interviews, rehabilitative employment, and related.[5]

12.    Only injunctive relief can provide a remedy.

13.    Orr respectfully submits that this Court has the power to decide whether Orr is totally and permanently disabled, and to protect Orr from multiple threats of irreparable harm.

II.    **MULTIPLE THREATS OF IRREPARABLE HARM**

14.    The purpose of an LTD policy is to protect an injured employee from undue hardship, during a time period when the employee may not be able to fend for himself.

15.    Insurers are not entitled to endanger the lives of claimants.

---

[5] At this juncture, it is also worth mentioning that the Courts have encountered numerous instances of patient injury from tests, examinations, interviews, rehabilitative employment, and related. For example, and although it is certainly unnecessary to recite a litany of instances involving direct injury received as a result of insurance-company requested exams, instances such as the following are not at all uncommon:

"…[C]laimant participated in a CME [Compelled Medical Examination] with Dr. Watson. During the examination, claimant complained of back pain. Watson directed claimant to raise her legs while lying on her back. Claimant stated that she could not raise her right leg. Watson then asked claimant to raise her left leg. When claimant raised her left leg, Watson moved it to a position beyond the point where claimant had moved it. Claimant felt immediate pain in the left low back and hip area. Medical tests indicated that Watson's maneuver had caused a new injury….Doctors recommended surgical treatment for that injury." (Robinson v. Nabisco, Inc., No. WCB 93-02515; CA A85643/SCS43918 (The Supreme Court of the State of Oregon, September 28, 2000), at Page 2.)

(Please note that whenever claimants suffer injury during exams – whether such exams are conducted under an ERISA Plan, a Workers' Compensation Plan [as in Robinson], or a Healthcare Plan, etc., nearly all such cases are removed to State Court, as the mandatory "preemptions," including those arising from ERISA, do not apply to the damages and/or injuries received.)

16.    There exist clearly defined dangers to Mr. Orr from the following:

(a) Reliance's policy language (Defendant's Exhibit A, with specific language detailed in Subsection g of Paragraph 16)

(b) Reliance's formally stated intent, on December 23, 2003, to refuse to waive its "rights" (Exhibit X) to demand exams that threaten the health and welfare of a severely disabled claimant.[6]

(c) Reliance's continued insistence[7] on more "proof." (December 23, 2003; Exhibit X)

(d) Reliance's flagrant attitude and insistence, also on December 23, 2003, that **no Court can "write these provisions out of the Reliance Standard policy."** (Exhibit X)

(e) Reliance's fixation on "money remedies," which are obviously very limited remedies. (As mentioned above, <u>absolutely no amount of money</u> can compensate Mr. Orr for the irreparable damage that Reliance seems intent on inflicting. And In light of the Reliance's formally stated intent, it should be

---

[6] As described in the Plaintiff's previously submitted briefs and documentation, Reliance had previously cancelled – in the year 2001 – an "IME" for which Orr was already prepared to attend. This was in the first part of 2001, during a time period when Orr could still have undergone certain types of tests, examinations, interviews, etc. Unfortunately, though, that time period is now over.

[7] Couched in terms of Reliance's "non-waival" of its rights to make certain demands and/or to carry out various actions that constitute a documented threat of irreparable harm.

reemphasized that the net sum of some $125,000 [rounded figure] that Reliance has agreed to pay,[8] some three-plus years late, and after multiple years of litigation, is <u>by no means</u> a demonstration of good faith.)

(f) Reliance's insistence that Orr has already been made whole, and its objection to any other type of relief, including relief to life and limb.

(g) Reliance's insistence on a "reinstatement"[9] of Orr that is, given the unique and exigent circumstances of Orr's injuries, and given his resultant fragility, next to meaningless.

---

[8] In the Court-Ratified Partial Settlement.

[9] Under the terms of Reliance's policy, a "reinstatement" could, in effect, be tantamount to a totally meaningless statement, as Reliance could – for instance – decide to terminate Orr, any time whatsoever, for any one of half a dozen "policy-supported reasons," such as:

(a) **"Refusal" to accept "Rehabilitative Employment" when "offered."**   (For instance, "An Insured will be considered able to perform Rehabilitative Employment if a Physician [gastroentereologist and/or related?] or licensed rehabilitation specialist [not even an M.D.] approved by us determines that he/she can perform such employment.  If an Insured refuses such Rehabilitative Employment, benefits under this Policy will terminate." [Page 13.0 of Defendant's Exhibit A, with a similar mention on Page 7.1])

(b) **"Failure" to provide <u>more</u> "proof," keeping in mind that Reliance's definition of "proof" is very vague in this *de novo* policy, meaning that the Court may choose to interpret the Policy as it sees fit.**   (For instance, "We will pay a Monthly benefit if an Insured:…(4) submits satisfactory proof of Total Disability to us." [Page 7.0 of Defendant's Exhibit A]. Other portions of policy, including Page 2.1, discuss "own" and/or "any" occupation constraints.  Also, Page 7.1 indicates "termination" when the claimant "fails to furnish the required proof.")

(c) **"Failure" to submit to "exams," "tests," "evaluations," "interviews," etc.**   (Page 4.0 and Page 13.0)

(d) **"Failure" to prove "under the regular care of a physician" keeping in mind that, once again, "regular" is a very amorphous and undefined word in this *de novo* policy** (Page 7.0).

(h) Reliance's <u>refusal</u> to cooperate, its <u>refusal</u> to make a good faith effort to read the medical records (and/or to act thereupon), its <u>refusal</u> to uphold its fiduciary duty, its <u>refusal</u> to recognize its conflict, and its <u>refusal</u> to recognize threat of bodily harm, do <u>not</u> provide Orr with the required relief.

## III.   <u>REQUEST FOR EQUITABLE RELIEF</u>

17.   Multiple physicians have made themselves perfectly clear, submitting[10] letters, reports, medical records, supporting documentation, and even going so far as to submit "Form 1041T," which is clearly labeled "Spinal Cord Injuries...**COURT-ORDERED INJ. RELIEF (PERM.)"** (Exhibits M, N, O, P, and Q.) (Capitalization and Emphasis supplied.)

18.   Accordingly, the Plaintiff respectfully requests the following:

A.   That Reliance Standard Life Insurance Company be enjoined from further endangering Edward W. Orr's fragile state of health by requiring tests, examinations, interviews, rehabilitative employment, and/or additional proof[11] of any type whatsoever.  Other restrictions have been duly noted by physicians,

---

[10] Over a multi-year time span, since 1996.

[11] Other than that specified in Part 4 of Form 1041T, *Court-Ordered Inj. Relief (Perm.)*

and the Plaintiff respectfully requests that Reliance be permanently[12] enjoined from any and all actions and measures that might cause further harm.

B.  The patient is helpless, and further requests that, in logical concurrence with his state of helplessness, this Court retain jurisdiction[13] "for subsequent review of any further adverse determination" (Kinstler v. First Reliance Standard Life Insurance Company, C.N. 96-CV-0921 (Second Amended Judgment;[14] S.D.N.Y. September 30, 1997), at page 2), under either the "own occupation"[15] or the "any occupation" time period of the policy.

---

[12] It is assumed that, owing to the nature of the issues involved, the Court will have adequate time to reach a decision on the matter of a permanent injunction before, for instance, Reliance may decide to discontinue benefits again – or before Reliance may decide to attempt inflict harm through additional "interviews" (such as those held in the year 2000; see RSL 196, 198, et al), or through "examinations, rehabilitative employment, etc." If, however, this assumption turns out to be incorrect, then the plaintiff respectfully requests, as a formal element of this Motion for Permanent Injunctive Relief, the granting of a preliminary injunction while the Court addresses the issue of the merits of the permanent injunction.

[13] Full jurisdiction, in all respects, as "substitute administrator" (DeFelice v. American International Life Assurance Company of New York, 112 F.3d 61, 66 (2d Cir. 1997)), as part of the existing case, and without any need for Orr to file a "new" case, etc.

[14] A copy of the Second Amended Judgment is attached as Exhibit Y. Also, it is important to mention that, as described in a subsequent paragraph, Ms. Martha Kinstler (of Kinstler, supra) was most definitely not suffering from Spinal Cord Injuries, or from any set of conditions comparably serious and/or comparably restrictive, so obviously the Court could allow the insurer to apply contractual conditions such as exams, evaluations, rehabilitative employment, and related. There was no threat of irreparable harm whatsoever, yet the Court still chose to retain jurisdiction, apparently as a result of the insurer's exercise of poor judgment.

[15] Please note that the "own occupation" time period shifts into an "any occupation" time period on September 24, 2004 (RSL167). Also, please note that, owing to

    (1) the *de novo* type of policy issued,

    (2) the threat of irreparable harm, and

    (3) the factual proof of qualification, even under the "any occupation" standard,

    (4) the insurer's refusal to cooperate, its refusal to make a good faith effort to read the medical records (and/or to act thereupon), its refusal to uphold its fiduciary duty, its refusal to recognize its conflict, and its refusal to recognize threat of bodily harm,

C.  Reliance should remain completely free to determine whether or not it wishes to pay Orr.  If it does not receive proof of regular care, as defined on Form 1041T, or if, for instance, the Christopher Reeve Foundation should discover miraculous ways to cure SCI, and Reliance films Orr jogging in the park, or if – for any other "reasonable reason" (please see Sections A and B above) – Reliance determines Orr not to be totally disabled, then Reliance should have every right to discontinue payments.

D.  But if and when Reliance should ever discontinue payments, then it is respectfully requested that this Court exercise its continued jurisdiction, and begin the process of conducting a *de novo* review of Reliance's decision within one hundred eighty (180) days.[16]

---

that there exists absolutely <u>no</u> requirement to "re-pose the question of 'any occupation'" on the aforementioned date (September 24, 2004) or thereafter.  In other words, the principle of "exhaustion of remedies" and/or related simply does not apply in this particular case.

Also, please note that the conditions in Sub-part #4 of this footnote <u>are not even a necessary condition</u> to the granting of an injunction in this particular case, as the threat of irreparable harm provides more than adequate authority for the granting of injunctive relief.  In fact, as will be described in the attached Memorandum of Law, ERISA cases involving irreparable harm often go far as to completely dispense with any discussion whatsoever of "which portion of §1132 and/or 'ERISA § 502' applies."

For instance, in <u>Zervos v. Verizon New York, Inc.</u>, 277 F.3d 635, 648 (2d Cir. 2002), an ERISA case involving injunctive relief for a patient deprived of life-essential care, the Court's authority was so well grounded in generally recognized principles of equity and injunctive relief, that – when it came time to grant the injunction – there was absolutely no need for any discussion (<u>or even a passing mention</u>) of §1132, or of "ERISA § 502," or of anything remotely related.  Nevertheless, even within the confines of ERISA statutes, there still exists clear authority for the granting of such relief, as will be shown in the Memorandum.

[16] The Plaintiff also respectfully requests the granting of any such other and further relief as this Court deems proper.

20

19.    Ms. Martha Kinstler (of Kinstler, supra) was afflicted with, in essence, a bad knee; she could even perform sedentary work, and yet the Court saw fit to retain jurisdiction in a case against the very same Defendant as in Orr's case.    **The Plaintiff respectfully submits that Orr has more than a bad knee, and that – of all people – he deserves to receive at least the same measure of protection[17] as Ms. Kinstler.**

20.    In summary, Orr respectfully moves this Court to grant permanent injunctive relief, as requested by multiple physicians who have documented the threat of irreparable harm, and as detailed in Paragraph 18 above.

## V.    LIST OF EXHIBITS[18]

A.    Social Security Award

B.    Total Disability Assessment (Dr. Eric Woodard)

C.    Dr. Mary Guerrera's File Shipment (>250 pages)

D.    The Timeline (and Dr. Guerrera's Form 14B Records)

E.    Reliance's Missing Invoice (for a missing portion of the claim file), plus Orr's Proof of Payment (canceled check) for a portion of the claim file that is missing

---

[17] In regard to the issue of continued jurisdiction, with said jurisdiction in Orr's case obviously including the "any occupation" time period of the policy.

[18] Please note that the "thumbnail descriptors" employed in this list are not meant to substitute for the full exhibit descriptions contained in the various briefs, letters, and original document sources in which the exhibits are referenced.

F.  Example Missing Letters (five sent from Reliance, and three sent to Reliance)

G.  Three "Statements of Disability and Undue Burden" (Form 127T), as submitted by three independent physicians (Dr. Mary Guerrera, Dr. Adam Perrin, and Dr. Mark Warner)

H.  Form 971, as completed by Dr. Adam Perrin

I.  Missing Chart Portion (plus forty-nine additional missing pages)

J.  Affidavit of Total and Permanent Disability, Dr. Mary Guerrera (plus reconfirmation of file shipment [>250 pages])

K.  Check received in nonconformance with the Court-ratified agreement

L.  Documentation regarding previous problems with Reliance's checks

M.  Statement of Total Disability and the Threat of Harm from Tests, Examinations, Interviews, Rehabilitative Employment, etc. (Dr. Mary Guerrera)

N.  Statement of Total Disability and the Threat of Harm from Tests, Examinations, Interviews, Rehabilitative Employment, etc. (Dr. David Katz)

O.  Statement of Total Disability and the Threat of Harm from Tests, Examinations, Interviews, Rehabilitative Employment, etc. (Dr. Adam Perrin)

P.  Statement of Total Disability and the Threat of Harm from Tests, Examinations, Interviews, Rehabilitative Employment, etc. (Dr. John Cannon)

Q.     Statement of Total Disability and the Threat of Harm from Tests, Examinations, Interviews, Rehabilitative Employment, etc.
       (Dr. Robban Sica)

R.     Diagnoses and Conditions, Dr. Eric Woodard

S.     (Reserved)

T.     Four thousand two hundred-plus pages (4,200+) pages of medical records[19]

U.     Very early document (1996) indicating major testing restrictions

V.     Letter of September 6, 2001, indicating the following: "All testing that can be done has been completed…"

W.     Power of Attorney Form, signed by the patient's wife

X.     Letter of December 23, 2003, from Reliance, indicating "non-waival" of its rights to make certain demands and/or to carry out various actions that constitute a documented threat of irreparable harm.

Y.     *Kinstler*, Second Amended Opinion, indicating continued jurisdiction of the Court "for subsequent review of any further adverse determination"

Z.     Letter of September 18, 2001, indicating the paradox of the patient's current condition (over-tested, over-evaluated, etc.) being a direct result of earlier "under-treatment"

AA.    Kinstler; Index to the *Defendant-Appellant's Appendix,* indicating that the first page of the Reliance policy (identical to Orr's policy in all material aspects) begins on "Appendix Page 'A346'"

---

[19] Please note that additional medical and disability records, including the SSA/employer's file from Dr. J. Cannon/UCONN, will be provided as available.

BB.   <u>Kinstler</u>; the Reliance Policy (identical to Orr's in all material aspects)[20]

CC.   Dr. Eric J. Woodard, Abbreviated Curriculum Vitae (Harvard)

DD.   Dr. Peter M. Black, Abbreviated Curriculum Vitae (Harvard)

EE.   Dr. David L. Katz, Yale IMC Director (Abbreviated Qualifications)

FF.   Dr. David L. Katz, Abbreviated Curriculum Vitae (Yale)

GG.   Dr. David L. Katz, *Clinical Epidemiology and Evidence-Based Medicine* (textbook; one of seven)

HH.   Settlement check that failed to immediately clear

II.   Incorrect check


SHEFFY & MAZZACCARO, LLP


Date:                          BY:   _____
                                     A. ALAN SHEFFY
                                     35 North Main Street
                                     Southington, CT 06489
                                     Telephone: (860) 620-9460
                                     ID# CT04366
                                     Attorneys for:
                                     Plaintiff, Edward W. Orr


---

[20] Please note that the first page of Reliance's Policy (in the <u>Kinstler</u> Appendix) was preceded by a tab denoting it as "Exhibit B," even though it appears in the above list as "Exhibit BB." The former tab was, of course, the one previously used in the appellate case.

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the foregoing upon counsel of record this date by United States Postal Service first class mail, postage pre-paid, addressed as follows:

Gary N. Stewart
Rawle & Henderson
25 North Front Street
Harrisburg, PA 17101

Date:

_____
A. ALAN SHEFFY

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| EDWARD W. ORR | : | |
| Plaintiff | : | Civil Action |
| vs. | : | No. 302 CV 1457 (SRU) |
| | | |
| RELIANCE STANDARD | : | |
| LIFE INSURANCE COMPANY | : | March 23, 2004 |
| Defendant | : | |

ORDER

AAND NOW, this _____ day of _____, 2004, upon consideration of Plaintiff's Motion for Injunctive Relief and Memorandum in Support and any response thereto, IT IS HEREBY ORDERED that Plaintiff's Motion is GRANTED.

_____

, J.