# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

EDWARD W. ORR
            Plaintiff           :

      vs.                :     Civil Action
                              :     No. 302 CV 1457 (SRU)

RELIANCE STANDARD     :
LIFE INSURANCE COMPANY  :
            Defendant    :     March 23, 2004

---

## THE PLAINTIFF, EDWARD W. ORR'S, MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR PERMANENT INJUNCTIVE RELIEF

### Preface

As reasonable and customary in ERISA cases involving unique and exigent circumstances, the Motion for Injunctive Relief is expected to contain an extra measure of detail in regard to the circumstances giving rise to Motion. In other words, the Motion itself contains certain historical and descriptive details[1] that need not be repeated in the Memorandum of Law.

Accordingly, since Orr's Motion was specifically constructed with the above constraints in mind, please note that Paragraphs 1 – 20 of the Motion, along with all remaining content of the Motion, are hereby reincorporated into this Memorandum. In addition, all previously submitted Exhibits, Memoranda, Motions, Letters to the Court, and other

---

[1] Including, where appropriate, a cursory overview of certain portions of the applicable law. The unique and exigent circumstances of this case necessitated such an overview, for purposes of clarification, in the Motion itself, especially given (1) the unusual circumstances posed by SCI [Spinal Cord Injuries], (2) the threat of irreparable harm, and (3) the type of relief requested. The Memorandum of Law will, of course, owing to its purpose, further explain the necessity for injunctive relief, within the context of expounding upon the legal argument.

Documentation (including Correspondence Between Counsel; the Court-Ratified Partial Settlement; and all related items) are reincorporated herein.[2]

This is not a typical disability case. Orr's future physical health and well being are at risk. Other cases, such as <u>Zervos</u>,[3] as only one example of many, have involved similar issues, and generally such cases are best served by beginning with an outline.

As a result, the following framework of discussion will guide this brief:

I.       THE FUNDAMENTAL BACKGROUND

     A.       Support for Injunctive Relief by Multiple Physicians

     B.       Unique and Exigent Circumstances Requiring Injunctive Relief

     C.       Multiple Threats of Irreparable Harm Requiring Injunctive Relief

     D.       Absolutely No Necessity to Prove Conflict, Breach of Fiduciary Duty, Poor Judgment, or Bad Faith

     E.       Endangerment of Life and Limb Takes Precedence Over All Other Factors

     F.       "Flaws" in the Claims Handling Process

     G.       "Flaws" in the Appellate Process

---

[2] At the conclusion of this Memorandum, there also appears a List of Exhibits, for ease of reference. Please note that, in regard to the "Exhibit-Letter Designation System" employed herein, certain letters have been expressly reserved for future use.

[3] <u>Zervos v. Verizon New York, Inc.</u>, 277 F.3d 635, 648 (2d Cir. 2002)

H.     Even Though It Was Not Necessary to Do So, All of the "Anomalies" in Section (D) Above Have Been Proven Anyway, Which Further Accentuates the Necessity for Special Relief

II.     ADDITIONAL POINTS OF LAW[4]

A.     Conflict of Interest

B.     Breach of Fiduciary Duty

C.     Poor Judgment

D.     Bad Faith

E.     Endangerment of Life and Limb

III.     CLOSING LEGAL ARGUMENTS

A.     A Question of Fact

B.     Clear Authority under ERISA § 502 (a) (3)[5]

1.     Precedence Over Any Possible Arguments of "Exhaustion," "Preemption," etc.

2.     Three Cases: Darland, Hall, and Kinstler

C.     No New Precedent (Zervos)

---

[4] Please note that, as mentioned previously, introductory points of law are also incorporated into Section I, with the express purpose of facilitating discussion of the unique parameters of this case. This method of organizing the Memorandum of Law is consistent with the handling of comparable cases involving similarly situated injunctive orders, and assists in streamlining the case.

[5] Under both the statute, and Supreme Court rulings (Varity, Great-West, et al, with specific case citations to be provided in the text)

IV.    CONCLUSION

V.    LIST OF EXHIBITS


\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

I.    **THE FUNDAMENTAL BACKGROUND**

Orr seeks injunctive relief[6] pursuant to Rule 65, Federal Rules of Civil Procedure,

and also pursuant to the Employee Retirement and Security Act of 1974 (ERISA), 29

U.S.C. § 1001, et seq. including § 1132 (a) (3) (B), also referred to as "ERISA § 502 (a)

(3)," and other designations. The latter section provides:

> A civil action may be brought − (3) by a participant, beneficiary, or
> fiduciary (a) to enjoin any act or practice which violates any provision of
> this subchapter or the terms of the plan, or (b) to obtain other appropriate
> equitable relief (i) to redress such violations or (ii) to enforce any
> provisions of this subchapter or the terms of the plan.

In State of Connecticut v. Physicians Health Services of Connecticut, Inc., 287 F.3d

110, 115 (2nd Cir. 2002), the Appellate Court commented about the significance of §

1132 (a) (3), citing precedential Second Circuit authority, along with a concurring

Supreme Court case, as follows:

> See Strom v. Goldman, Sachs & Co., 202 F.3d 138, 148 (2nd Cir. 1999)
> ("Section [1132 (a) (3)] 'acts as a safety net, offering appropriate equitable
> relief for injuries caused by violations [of ERISA] that [§ 1132] does not
> elsewhere adequately remedy.'") (quoting Varity Corp. v. Howe,[7] 516 U.S.

---

[6] In addition to the recovery of injunction-related Attorney's fees, costs and related, pursuant to the
Employee Retirement and Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq. including § 1132 (a)
(1) (B), also referred to as "ERISA § 502 (a) (1) (B)," et al. Recovery of virtually all litigation-related
expenses, inclusive of such items as witness fees, is also allowable under 29 U.S.C. § 1132 (g) (1), et al.

[7] A subsequent Supreme Court case, Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 221
(2002), Court reaffirmed Varity as follows:

> In Varity Corp., we explained that § 502 (a) (3) is a "'catchall' provisio[n]" that act[s] as a
> safety net, offering appropriate equitable relief for injuries caused by violations that § 502
> does not elsewhere adequately remedy."

1

489, 512, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996)) (first two brackets in original).

The Plaintiff respectfully submits that, owing to the unique and exigent circumstances of this case, the aforementioned "safety net" should be employed to protect Orr, who is afflicted with SCI,[8] from the threat of irreparable harm.

As explained more fully below, there exists in this case the threat of irreparable harm, as documented by multiple physicians as unique and exigent circumstances exist, and Orr seeks the protection of the Court.

### A.     Injunctive Relief Requested by Multiple Physicians

As set forth in the Motion attached hereto, multiple physicians who have treated Orr support a claim for permanent injunction.  Exhibits N, O, P, and Q, along with Paragraph 2 of the accompanying Motion are hereby reincorporated in their entirety.

### B.     Unique and Exigent Circumstances

Exhibit R (one hundred forty-seven diagnoses) is reincorporated in its entirety, as further proof that this is not a typical disability case.  In combination with statements such as the following, it is clear that Orr's Spinal Cord Injuries are not the type of injuries

---

[8] Spinal Cord Injuries

normally encountered, and that the resultant fragility of the patient is such that a clearly

demonstrable threat of irreparable harm exists if the patient is mishandled:[9]

> The patient has spinal cord (SCI) and/or related injuries; and, as a result,
> his/her condition is fragile....Multiple diagnoses and/or conditions exist,
> and there exists the threat of irreparable harm from tests, examinations,
> interviews, rehabilitative employment, etc....No more tests, examinations,
> interviews, and/or related are to be permitted, as the patient may suffer
> irreparable harm therefrom. (Exhibits N, O, P, and Q)

## C.    **Multiple Threats of Irreparable Harm**

There exist clearly defined dangers[10] to Mr. Orr from the following:

(a) Reliance's policy language

(b) Reliance's formally stated intent to refuse to waive its "rights" to demand exams

that threaten the health and welfare of a severely disabled claimant.

(c) Reliance's continued insistence on more "proof."

(d) Reliance's fixation on "money remedies," which are obviously very limited

remedies.

---

[9] In regard to "mishandling," the Plaintiff begins by referencing Exhibit X, a formal document from Reliance Standard Life Insurance Company, in which the insurer clearly refuses, in no uncertain words, to waive the right to cause irreparable harm to the patient, even going so far as to state that no Court can intervene. This document, along with other certain documents to be described herein, constitutes a clear threat to life and limb.

[10] Precise references to a letter from Reliance (Exhibit X), and also to the numerous sections of Reliance's Policy (2.1; 7.0; 7.1; 13.0; et al) are included in the accompanying Motion.

(e) Reliance's insistence that Orr has already been made whole, and its objection to any other type of relief, including relief to life and limb.

(f) Reliance's insistence on a "reinstatement" of Orr that is, given the unique and exigent circumstances of Orr's injuries, and given his resultant fragility, next to meaningless.

### D.    Absolutely No Necessity to Prove Conflict, Breach of Fiduciary Duty, Poor Judgment, or Bad Faith

Although there exist literally dozens of instances of conflict, breach of fiduciary duty, poor judgment, and bad faith, the unique circumstances of Orr's case do not require the existence of even one such "anomaly" in the insurer's behavior.  As shown below, Reliance's policy defines "Injury" as follows:

> "Injury" means bodily injury resulting directly from an accident, independent of all other causes.  The injury must cause Total Disability which begins while insurance coverage is in effect for the Insured (Defendant's Exhibit A, Policy Page 2.0).

Suppose, for the sake of argument, the following example:   During Orr's accident, there had been only one injury, rather than multiple injuries – and only one diagnosis or condition – rather than one hundred forty-seven (147). And this one injury, diagnosis, or condition was quite unique, and easy to describe, requiring only one simple word.  Coma.  This would render Orr speechless.  Reliance might argue that it hasn't had the rights outlined in the policy, that is:

4

We will, at our expense, have the right to have a claimant **interviewed**...
(<u>Id</u>. Page 4.0) (Emphasis supplied.)

Under this scenario, all Reliance has to do is schedule an "interview" and argue that Orr has not satisfied the conditions of the contract, correct. Reliance has exercised its rights to enforcement of the terms of its contract. Or, in the words of Reliance's Counsel, in a letter already sent to Orr, "We will not agree to any settlement agreement which waives...rights which exist under the policy" (Exhibit X).

Accordingly, Reliance might argue that it would have every right to discontinue payments under this coma example. And that the court did not have the power to alter the policy (Exhibit X).

Under this scenario, t is an undisputed fact that Orr did <u>not</u> answer the interviewer's questions; it is an undisputed fact that Orr did <u>not</u> live up his part of the bargain; and it is an undisputed fact that the contract has <u>not</u> been fulfilled. Obviously, then, "coma" is not a covered "bodily injury" under the "Definitions" section of Reliance's policy, as Reliance would argue should be obvious to virtually anyone reading the contract.

For the sake of review, and because it is so important to our upcoming legal analysis, Reliance's definition is again shown below:

"Injury" means bodily injury resulting directly from an accident, independent of all other causes. The injury must cause Total Disability which begins while insurance coverage is in effect for the Insured (Defendant's Exhibit A, Page 2.0).

Obviously anyone reading the above should understand that "coma" is <u>not</u> a covered condition.

Further, suppose, for the sake of argument, that during Orr's accident, there had been one hundred forty-seven (147) injuries, rather than just one, and that – owing to the summation of Orr's multiple injuries, and Orr's resultant condition of increasing fragility – there existed "the threat of irreparable harm from tests, examinations, **interviews**, rehabilitative employment, etc." (Dr. David Katz Dr. Adam Perrin, Dr. John Cannon, Dr. Robban Sica; Exhibits N, O, P, and Q) (Emphasis supplied).

Again, under this present scenario, Orr invalidated the policy. Again, all Reliance has to do is schedule an "interview" and argue that Orr has not satisfied the conditions of the contract. Reliance is standing on its contractual rights. And one of these rights is the enforcement of the terms of its contract. Or, in the words of Reliance's Counsel, in a letter already sent to Orr, "We will not agree to any settlement agreement which waives...rights which exist under the policy" (Exhibit X).

Now let's return to our original example – Orr with only one injury, and that injury being coma. (At this juncture, it is also important to mention that <u>the Plaintiff's further use of this example is not offered in jest, especially in regard to the "employment survey" portion of the example</u>, as all basic principles thereof are derived from an actual

case.[11]) Furthermore, let us suppose that Orr's occupation were the same as that of Christopher Reeve's – acting.

Under the terms of "Rehabilitation Benefit" clause (Page 13.0) of Reliance's policy (as shown below), and in conjunction with a Reliance-conducted employment survey (mailed to directors) indicating that Hollywood suffers a dearth of qualified coma victims – to play various roles on television and in movies – Reliance offers Orr a job. Orr refuses. (Actually, Orr says nothing, which Reliance logically perceives to be a "no" answer.) The result is benefits terminated.

> An Insured will be considered able to perform Rehabilitative Employment if a…licensed rehabilitation specialist [perhaps also the individual performing the aforementioned survey] approved by us determines that he/she can perform such employment. If an Insured refuses such Rehabilitative Employment, benefits under this policy will terminate. (Defendant's Exhibit A, Page 13.0).

Orr has failed to meet the conditions of the contract.

The absurdity of these scenarios raises serious questions in this case. For Reliance to argue, as it already has in the instant case, for an interpretation of the policy (the "contract") that is so <u>extreme</u>, is indicative of nothing short of bad faith,[12] especially when the insurer's argument involves a direct threat of physical harm to Orr. We will

---

[11] Involving Reliance as the Defendant, the name of which – along with exact case details – will be disclosed in an upcoming discussion of Reliance-sponsored DOT surveys, etc.

[12] Our discussion here in Section D obviously began by noting that such factors as "bad faith" did <u>not</u> have to be proven – as long as we took time to examine the contract – but then, unfortunately, our analysis of the contract seems to have led us full circle to a determination of bad faith anyway.

return to this threat, and to our example, in just a moment, but first of all, the following

excerpt is provided to illustrate the essential fallacy of Reliance's argument:

> Defendant's interpretation of its right...is "arbitrary and capricious" **because it would render meaningless its own coordination of benefits [and/or, as in Orr's case, the very <u>definition</u> of an injury or condition qualifying for benefits]** (see <u>Moench v. Robertson</u>, 62 F.3d 553, 566 (3rd Cir. 1995); <u>Farm Bureau Gen. Insur. Co v. Morton Buildings, Inc.</u>, No. 5:97-CV-191 (W.D. Mich. Aug 28, 1998)...
>
> (In <u>Allstate Insurance Company v. Sherwin-Williams Company Group Comprehensive Health Care Coverage Plan</u>, No. 5:98-CV-118 (W.D. MI 1999), at Page 7. (Emphasis supplied.)

Making a fallacious argument is one thing, but making a threat to life and limb is

another – yet the latter is precisely what the Reliance Standard Life Insurance Company

has chosen to do.  No one forced Reliance to make the stand that it has communicated

to Orr, and its stand is perfectly clear.  Thus far, in our example of the coma victim –

which is entirely apposite to the instant case, as we have shown – we have dealt <u>only</u>

<u>with situations excluding harm to the coma victim</u>.  We have seen him interviewed, we

have seen him decline a job, and now we are about to see him undergo an "IME"

(Independent Medical Examination[13]).

But wait, multiple physicians have intervened, and have documented the following:

> The patient has spinal cord (SCI) and/or related injuries; and, as a result, his/her condition is fragile.  Multiple diagnoses and/or conditions exist, and there exists the threat of irreparable harm from tests, examinations, interviews, rehabilitative employment, etc.

---

[13] And/or an "Insurer Medical Examination," a "PCE" (Physical Capacities Examination), an "FCE" (Functional Capacity Evaluation, an "MAE" (Medical Arbiter Examination), a "CME" (Compelled Medical Examination), and/or any other type of review, testing, follow-up, etc.

No more tests, examinations, interviews, and/or related are to be permitted, as the patient may suffer irreparable harm therefrom. The patient has already undergone multiple tests, examinations and/or interviews in regard to determining the extent to which he/she was/is/will be disabled, and/or in regard to the extent that he/she can be rehabilitated (past/present/future).

[T]he patient's health is not to be further jeopardized...Special circumstances exist, and he/she cannot be expected to gather any more proof now or in the future, except for the proof described...[T]he definition of "under the regular care of a physician" for this patient is as follows: At least twice per calendar year, unless the patient cannot be safely transported this often...

(Dr. David Katz, Dr. Adam Perrin, Dr. John Cannon, and Dr. Robban Sica; Exhibits N, O, P, and Q)

What happens next?  Well, by now, as luck would have it, the coma victim's case has come to the attention of an attorney who seeks a permanent injunction stating the following:

1. That Reliance Standard Life Insurance Company be enjoined from further endangering Edward W. Orr's fragile state of health by requiring tests, examinations, interviews, rehabilitative employment, and/or additional proof[14] of any type whatsoever.  Other restrictions have been duly noted by physicians, and the Plaintiff respectfully requests that Reliance be permanently enjoined from any and all actions and measures that might cause further harm.

---

[14] Other than that specified in Part 4 of Form 1041T, *Court-Ordered Inj. Relief (Perm.)*

2.  The patient is helpless, and further requests that, in logical concurrence with his state of helplessness, this Court retain jurisdiction[15] "for subsequent review of any further adverse determination" (Kinstler v. First Reliance Standard Life Insurance Company, C.N. 96-CV-0921 (Second Amended Judgment;[16] S.D.N.Y. September 30, 1997), at Page 2)), under either the "own occupation"[17] or the "any occupation" time period of the policy.

---

[15] Full jurisdiction, in all respects, as "substitute administrator" (DeFelice v. American International Life Assurance Company of New York, 112 F.3d 61, 66 (2d Cir. 1997)), as part of the existing case, and without any need for Orr to file a "new" case, etc.

[16] A copy of the Second Amended Judgment (which was affirmed by the Appellate Court) is attached as Exhibit Y. Also, it is important to mention that, as described in a subsequent paragraph, Ms. Martha Kinstler (of Kinstler, supra) was most definitely not suffering from Spinal Cord Injuries, or from any set of conditions comparably serious and/or comparably restrictive, so obviously the Court could allow the insurer to apply contractual conditions such as exams, evaluations, rehabilitative employment, and related. There was no threat of irreparable harm whatsoever, yet the Court still chose to retain jurisdiction, apparently as a result of the insurer's exercise of poor judgment.
Additionally, it is important to note that the Reliance Policy in Kinstler was the same as in Orr's case, in virtually all material aspects. Accordingly, the Kinstler policy is shown in Exhibit BB, from the Appellate Court's Master File (No. 97-9384), and in illustration of the fact that there is absolutely no reason whatsoever why Orr should not receive at least the same benefit of the Court's continued jurisdiction, as Ms. Martha Kinstler did. (Please note that Exhibit AA is simply the official index from the Appellate Court Index Volume, entitled the Defendant-Appellant's Appendix, from which Exhibit BB is derived.)

[17] Please note that the "own occupation" time period shifts into an "any occupation" time period on September 24, 2004 (RSL167). Also, please note that, owing to

(1) the de novo type of policy issued,

(2) the threat of irreparable harm,

(3) the factual proof of qualification, even under the "any occupation" standard, and

(4) the insurer's refusal to cooperate, its refusal to make a good faith effort to read the medical records (and/or to act thereupon), its refusal to uphold its fiduciary duty, its refusal to recognize its conflict, and its refusal to recognize threat of bodily harm,

that there exists absolutely no requirement to "re-pose the question of 'any occupation'" on the aforementioned date (September 24, 2004) or thereafter. In other words, the principle of "exhaustion of remedies" and/or related simply does not apply in this particular case.

3. Reliance should remain completely free to determine whether or not it wishes to pay Orr. If it does not receive proof of regular care, as defined on Form 1041T, or if, for instance, the Christopher Reeve Foundation should discover miraculous ways to cure SCI, and Reliance films Orr jogging in the park, or if – for any other "reasonable reason" (please see Sections 1 and 2 above) – Reliance determines Orr not to be totally disabled, then Reliance should have every right to discontinue payments.

4. But if and when Reliance should ever discontinue payments, then it is respectfully requested that this Court exercise its continued jurisdiction, and begin the process of conducting a *de novo* review of Reliance's decision within one hundred eighty (180) days.[18]

### E.     Endangerment of Life and Limb Takes Precedence Over All Other Factors

As described above – and as will be further accentuated in the ensuing discussions of conflict, breach of fiduciary duty, poor judgment, and bad faith – the Plaintiff has proven the following:

---

[18] The Plaintiff also respectfully requests the granting of any such other and further relief as this Court deems proper.

11

1.  The existence or threat of irreparable injury or harm – perhaps death – if the injunction is denied.

2.  There is no harm to Reliance from disallowing its extreme and erroneous interpretation of its own contract.

3.  Finally, given the seriousness of the threat to Orr's health should he be harmed by Reliance, the public interest is served by enjoining the insurer from harming a victim of SCI in any manner whatsoever.[19, 20]

F.    **"Flaws" in the Claims Handling Process**

---

[19] It is assumed that, owing to the nature of the issues involved, the Court will have adequate time to reach a decision on the matter of a permanent injunction before, for instance, Reliance may decide to discontinue benefits again – or before Reliance may decide to attempt inflict harm through additional "interviews" (such as those held in the year 2000), or through "examinations, rehabilitative employment, etc." If, however, this assumption turns out to be incorrect, then the Plaintiff respectfully requests, as a formal element of the Motion for Permanent Injunctive Relief, the granting of a preliminary injunction while the Court addresses the issue of the merits of the permanent injunction.

If, therefore, it becomes necessary for the issue of a preliminary injunction to be addressed, then obviously the Court will obviously need to consider what is commonly listed as a "Supplemental Factor" (supplemental in regard to the three factors listed in the main text above), as shown below:

> "...[E]ither (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief." Resolution Trust Corp. v. Elman, 949 F.2d 624, 626 (2nd Cir. 1991). This second "serious questions" prong is also frequently termed the "fair ground for litigation" standard. See, e.g., Sperry Int'l Trade, Inc. v. Government of Israel, 670 F.2d 8, 11 (2d Cir. 1982). (In Lieutenant Colonel Jane Abel v. United States, 44 F.3d 128, 130-131(2nd Cir. 1995))

[20] These three factors are, of course, the classic elements as described in such cases as Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency, 649 F.2d 71, 74 (1st Cir. 1981); Allison v. Froehlke, 470 F.2d 1123, 1126 (5th Cir. 1972); et al.

Benefits were unfairly delayed for more than three years,[21] and as will be described in a subsequent section, such delay clearly indicates an unequivocal Breach of Fiduciary Duty under Second Circuit precedent. In addition, the following procedural and substantive errors[22] occurred:

1.    Selective review of the records (RSL 280 – 285, et al)

2.    Missing records (Exhibit C, et al)

3.    Unfair application of the incorrect DOT (job classification) (RSL 237, et al)

4.    Records review by an unqualified "specialist" (a gastroenterologist) (RSL 280, et al)

5.    Failure to perform an IME[23]


G.    "Flaws" in the Appellate Process

---

[21] Numerous factual details, including such things as the length of time benefits were delayed, have already been clearly referenced by page number in previous briefs and documents; therefore this discussion will not clutter the text by repeating all of the more than two hundred specific references to Exhibits and/or RSL numbers already referenced. (Where necessary, certain specific references will obviously be reemphasized, of course, for purposes of clarity.)

[22] Many of which were much more egregious in nature than the aforementioned Breach of Fiduciary Duty represented by the three-year delay.

[23] Reliance never examined Orr, and even canceled (RSL 208) plans for an IME/FCE that had been scheduled by Reliance, and that had already been communicated to the attorney handling the Plaintiff's LTD claim (RSL 7).

Although the policy does not require, as a necessary condition, an IME, there exists clear case law (to be discussed) indicating that, in regard to special and/or unusual disabilities, the absence of an IME constitutes poor judgment (and of course a breach of fiduciary duty). Such case law will be mentioned in Section II. It is also worthy of note that, given the nature of Spinal cord Injuries, it would also have been prudent – for a wide variety of reasons – to perform an IME early on. Reliance paid benefits for more than a year, and it certainly would have behooved Reliance to take a close look at a patient afflicted by unusual injuries – before it was too late.

Also, as shown in Exhibit F, on a letter dated June 16, 2000, Reliance did not carry through on other plans to personally examine and/or "visit" Mr. Orr. This is most unfortunate, too, as Mr. Orr could have accepted a limited visit from Reliance four years ago, in the year 2000.

In <u>Zervos v. Verizon</u>, 277 F.3d 635, 648 (2nd Cir., January 28, 2002),[24] the Court made it clear that in situations where the Plaintiff's condition is fragile, and/or when time is of essence, that numerous special measures are appropriate, including close scrutiny of the appellate process employed by the insurer. The instant case is also well served by close scrutiny of the appellate process, especially given the fact that Reliance seems to have been quite fearful of not only examining Orr,[25] but also of examining the record.

In fact, so fearful has Reliance been of examining the record, both during the claims handling process and the appellate process,[26] that it has intentionally erected numerous barriers to any review of said record. Such barriers have included the following:

1. **Misstating the existing record, wherever it conflicted with Reliance's position**

   a. For instance, Reliance completely misstated the record when it claimed, numerous times in its argument (P6-10; see especially P7, P8),[27] that "an adjuster from another insurance company" filled out the

---

[24] There were two separate appeals in <u>Zervos</u>, with the above citation referring to the final appeal, in which multiple references to "flaws in the appellate process" (at 648, et al) were contained.

[25] When he could still be examined.

[26] Please note that, because of the natural overlap between the two processes, this Sub-section will occasionally cover both associated time periods.

[27] Please note that the page number references in this particular section refer to "The Defendant's Reply Brief and Brief in Response to the Plaintiff's Cross-Motion for Summary Judgment," dated June 18, 2003.

form denoting Orr's job as "Light Work" (more than sedentary).  **Ms. Carol Foley, of BYK-Chemie (Orr's employer), filled out the form, and clearly signed her name (RSL 145 – 146).  Reliance's own record plainly showed Ms. Foley to be a formal employee of BYK-Chemie, as evidenced by her signature on BYK-Chemie letterhead (RSL 143).**

b.  Reliance also misstated the record when it claimed that Orr never took the "opportunity" (P6) to request a copy of his claim file during the appeal process.  Not only did Orr request a copy (RSL 36), but he received a stripped-down copy (RSL 16) that prompted the attorney handling his LTD claim to write a letter to Reliance about missing records, and about other problems with the file.  *Parts of the letter are clearly shown in Reliance's administrative record, but most pages (including half of a chart, and forty-nine additional pages, to be exact; Exhibit I)*[28] *of said letter (RSL 6-14; 242-279; with the RSL citations obviously referring only to those pages still remaining in the record) – and its attachments – are missing from Reliance's claim file, including half of page RSL 242 (a specially prepared 11" X 17" chart sent by the Plaintiff's counsel).*  Needless to say, Reliance did not correct its records problems.

---

[28] Numerous additional items are missing from the administrative record, including correspondence sent to Reliance, and correspondence received from Reliance (Exhibit F, et al)

c. Reliance's repeated misstatement (P3) of the record in regard to its claim that Dr. Khawaja had released Orr to work was absolutely ludicrous, as the very form cited by Reliance clearly indicates *Zero hours of sitting, standing, walking or driving (RSL 180; Section E, Description of Patient's Restrictions and Limitations).*

2. **Harassing the Plaintiff's Coordinating Physician (Dr. Guerrera)**

**Reliance repeatedly mandated (within thirty-two days; from November 6, 2000, to December 8, 2000) that the physician fill out <u>multiple copies of precisely the same forms and records that the physician had already filled out.</u> Reliance would NOT accept <u>photocopies of the previous forms and records, and insisted that the Coordinating Physician waste her valuable time filling out precisely the same documentation again</u>.** The physician even noted Reliance's repetition in the administrative record (RSL 34, also at RSL 50; compare to RSL 33, 49; see also mention by the attorney handling the LTD claim on behalf of the Plaintiff, at RSL 18-19; RSL 54-55).

Please also note that, in regard to another point on which the Defendant clearly erred, the physician specifically used the word **"<u>mailed</u>"** (RSL 34, also at RSL 50), under a penalty of perjury, and on a special form provided by Reliance, thereby disproving the Defendant's attempt (P6) to cast aspersions on the veracity of Dr. Guerrera's statements. The Defendant was

so disoriented (also P6) about the content of the claim file that the Defendant mistakenly referred to duplicate attachments in Attorney Joseph Mazzaccaro's two CERTIFIED letters (*Green Card/Cert. # 7099 3400 0015 1214 1618 at RSL 56; and Green Card/Cert. # 7099 3220 0010 9901 3632 at RSL 57*) as having been faxed to Reliance by a physician.

If the attorney handling the LTD claim on behalf of the Plaintiff had not sent duplicate after duplicate (see certified medical records at RSL 28-30; 44-46; 26-27; 42-43; 22; 38; 23-24; 31-35; 39-40; 47-51) of basic records from Dr. Woodard, Dr. Kavic, Dr. Warner, and Dr. Guerrera, then there would be only two pages (RSL 212-213) of medical documentation, COMBINED, from all of the medical records listed at the beginning of this paragraph, in the administrative record. This is in spite of file notations, overtly confirmed mailings (RSL 34, RSL 50) and signed physician statements (also RSL 34, RSL 50).

## 3. Continuing to harass the very same Coordinating Physician

Reliance refused (P6) to acknowledge or accept a *second* copy of a twelve-part medical records compilation (Dr. G1 - Dr. G 264***) that the physician reaffirms, *in a document bearing her own signature* (cover letter attached to Exhibit C), as having already been sent to Reliance on December 8, 2000.

**4. Similarly harassing (in regard to the so-called "appeal"; see P6) the attorney handling the LTD claim**

Reliance harassed the aforementioned attorney to the point where he finally exercised his full legal rights, under clearly stated ERISA statutes, to demand that Reliance pay any and all subsequent photocopy costs: "...if your company would wish to purchase any of our medical records from our file, please so advise" (RSL 6; see also multiple [and identical] letters sent by said attorney to Reliance *[RSL 17-51; RSL 53-57, Green Card/Cert. # 7099 3400 0015 1214 1618 at RSL 56; and Green Card/Cert. # 7099 3220 0010 9901 3632 at RSL 57; see also ERISA case law below]*).

**5. Harassing the Plaintiff by violating additional ERISA statutes**

ERISA clearly forbids that any claimant be charged a fee (RSL 16) for the right of having an appeal (P6). Orr received, in unequivocal violation of ERISA statutes, two invoices from Reliance (one invoice shown at RSL 16; and the second shown in Exhibit E), both as a precondition of the Plaintiff's right to an appeal. This is not a moot point, as the regulations clearly provide that "claim procedures adopted by a plan **will not be deemed to provide a claimant with opportunity for a full and fair review unless the plan: 'Provide[s] that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.'"**

(Emphasis supplied.) 29 C. F. R. §2560.503-1(h)(1), as cited in <u>DeLeon vs.</u>
<u>Bristol-Myers Squibb Company Long Term Disability Plan</u>, 203 F.Supp.2d
1181, 1193 (D. OR 2002).


(See also 29 C.F.R., Part 2560, Rules and Regulations for Administration and
Enforcement; Claims Procedure; <u>Federal Register</u>, Vol. 42, No. 103; Friday,
May 27, 1977; Page 27427, which further reinforces the need for the insurer
to bear all costs of an appeal.)

## 6. Failing to address its conflict of interest[29] in its discussion of "evidence outside the administrative record" (P4 – P6).

The Defendant ignored not only Orr's mention of the record being
incomplete (RSL 6, 10; see especially "...missing records problems also
exist," RSL 10), but also ignored its *own* mention, on *three* occasions, of the
record being incomplete (RSL 321-322; 168; 166), and merely argues that Orr
has failed to provide, with any "specificity" (P5), good cause for the admission
of evidence outside the administrative record.

## 7. Reliance's operational strategy has consisted of misstating, misinterpreting, and discarding records.

Not only has Reliance misstated, misinterpreted, and discarded records,
but it has also completely ignored objective medical evidence proving total

---

[29] This is obviously only one of many instances indicative of Reliance's failure to address its conflict of
interest.

disability – whether such evidence was contained <u>in</u> the administrative record, or <u>outside</u> of the administrative record.  Reliance's conflict of interest has progressed to the point of bad faith.

## 8. Gross inconsistency

Any insurer who formally requires the claimant to sign an "Authorization to Secure [Social Security] Award Information Form" (RSL 64) – and who then <u>refuses</u> (P10-P11) to consider the very same Social Security Award – is not acting in good faith.

## H.      <u>Although it Was Not Necessary to Do So, All of the "Anomalies" in Section (D) Above Have Been Proven Anyway, Which Further Accentuates the Necessity for Exigent Relief</u>

Our discussion has thus far documented dozens of instances of conflict, breach of fiduciary duty, poor judgment, and bad faith.  Even so, the unique circumstances of Orr's case do not require the existence of even <u>one</u> such "anomaly."  This further accentuates the need for exigent relief.  Moreover, Reliance has chosen to argue for an interpretation of its policy (the "contract") that is so <u>extreme</u>, that it represents a fatal flaw in the insurer's objection to injunctive relief.  More than a "flaw," it too is nothing short of bad faith, as it involves a direct threat of physical harm to a helpless invalid.