## II. ADDITIONAL POINTS OF LAW

### A. Conflict of Interest

In <u>Bedrick v. Travelers Insurance Company</u>, 93 F.3d 149, 154 (4th Cir. 1996), the Court was faced with a difficult case involving cerebral palsy and quadriplegia, and clarified the role of the ERISA fiduciary as follows:

> A fiduciary with a conflict of interest must act as if he is "free" of such a conflict. <u>Doe</u>[30] 3 F.3d at 87. **"Free" is an absolute. There is no balancing of interests;** ERISA commands undivided loyalty to the plan participants. Travelers did not evaluate Ethan's physical…claims in a manner consistent with this duty. (Emphasis supplied.)

The Plaintiff respectfully submits that, given the aforementioned "flaws," neither did Reliance evaluate Edward W. Orr's claim "in a manner consistent with this duty."

Reliance is afflicted not only with a structural conflict, which has been specifically referenced and discussed at length in multiple briefs,[31] but also afflicted with an expressed conflict that has tainted its judgment.

### B. Breach of Fiduciary Duty

---

[30] <u>Doe v. Group Hospitalization & Medical Services</u>, 3 F.3d 80 (4th Cir. 1993).

[31] On the first page of its letter dated December 4, 2003, Reliance overtly admits to a dual role, an admission which is indicative of a structural conflict, and which permits not only the admission of evidence outside the administrative record (<u>DeFelice v. American International Life Assurance Company of New York</u>, 112 F.3d 61, 67 (2d Cir. 1997)), but also the replacement of the administrator by the Court. In other words, the fact alone, that Reliance acts both as Plan Administrator and pays the disability benefits, makes Reliance a conflicted administrator requiring the Courts to "exercise fully their power to review de novo and to be substitute administrators." (<u>Parker v. Reliance Standard Life Insurance Company</u>, 2000 WL 97362 at 3 (S.D.N.Y. Jan 27, 2000)

21

ERISA requires plan fiduciaries[32] to "discharge [their] duties with respect to a plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104 (a) (1). In addition, the statute explicitly provides that insurers must provide a "full and fair" review (See 29 U.S.C. § 1133 (2) (1985)), in order to fulfill fiduciary obligations.

Given the aforementioned "flaws" in both the claims handling process and the appellate process – coupled with the irreparable damage that Reliance seems intent on inflicting on a patient with Spinal Cord Injuries, it is impossible to conclude that Reliance has not breached its fiduciary duty on numerous occasions.

As mentioned in Part I above, benefits were also unfairly delayed for more than three years, and such delay clearly indicates a Breach of Fiduciary Duty under Second Circuit precedent:

> ...[P]ayment of those benefits was delayed nearly five years....Unless such a delay is justified, **we see no reason why it does not constitute a breach of fiduciary duty.**
>
> Dunnigan v. Metropolitan Life Insurance Company, 277 F.3d 223, 230 (2nd Cir. 2002) (Emphasis supplied)

Interestingly enough, in a recent case against Reliance,[33] the insurer even went so far as to argue that there was no such thing as "fiduciary duty," As one might expect, however, the Court disagreed with the insurer's extreme interpretation of ERISA law,

---

[32] Reliance admits to being a fiduciary, in the second paragraph of its letter to the Court dated December 4, 2003.

[33] Involving essentially the same Reliance policy language (or contract) as in the instant case.

22

and clarified the fact that Reliance's contracts were no different from those of any other insurer:

> Under 29 U.S.C. § 1104(a), ERISA requires a fiduciary to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."
>
> Because the Reliance's long-term disability plan is covered by ERISA, Plaintiff's cause of action for breach of fiduciary duty is permissible. Defendant's Motion to Dismiss Plaintiff's second claim is denied.
>
> Chamblin v. Reliance Standard Life Insurance Company, 168 F.Supp.2d 1168, 1172 (Dist CA 2002).

The Supreme Court[34] has held that a breach of fiduciary duty – such as those numerous instances described herein – allows the offended party to claim equitable remedies under ERISA. As no amount of money remedies can make Orr whole, the Plaintiff respectfully requests equitable relief.

### C. Poor Judgment

The number of instances in which poor judgment has been demonstrated by Reliance are numerous, and integrally related to the dozens of "anomalies" identified herein. For instance, as clearly illustrated by Woo v. Deluxe, 144 F.3d 1157, 1161 (8th Cir. 1998), Reliance exhibited much more than merely "poor judgment" in having a gastroenterologist (RSL 280) review Orr's claim:

---

[34] Varity v. Howe, 516 U.S. 489, 514-515 (1996); See also Great-West v. Knudson, as previously discussed in Section I. (Please note, however, that a breach of fiduciary duty is not a necessary condition for the availability of equitable relief, especially where threat of irreparable harm exists.)

23

> Hartford failed to use proper judgment by not having a sceleroderma expert review her claim. See <u>Hightshue v. AIG Life Ins. Co.</u>, 135 F.3d 1144, 1148 (7th Cir. 1998). This **serious procedural irregularity** also had a sufficient connection to the decision reached...because Hartford's "actual decision was reached without reflection and judgment." <u>Buttram</u>, 76 F.3d at 901. (Emphasis supplied.)

The Court also went on to discuss the effect of the insurer's "financial conflict" (the same type of conflict that exists with Reliance in the instant case), going so far as to characterize the insurer's conduct as "egregious":

> Here, we find Hartford's failure to use proper judgment, when combined with the financial conflict, to be **egregious conduct**. (<u>Id</u>., at 1162) (Emphasis supplied.)

The Court also characterized the insurer's actions as indicative of "a serious breach of the plan administrator's fiduciary duty to her" (<u>Id</u>., at 1160-1161). Obviously, then, one can again conclude that, by direct analogy, Reliance breached its fiduciary duty to Orr by displaying poor judgment.

<u>Pinto v. Reliance Standard</u>, 214 F.3d 377, (3rd Cir. 2000) is also very instructive:

> **First**, Reliance Standard's reversal of its initial decision[35] to grant benefits was itself questionable. **Second**, its final report credited the evidence favorable to denial while inadequately explaining why it rejected the contrary evidence – the same evidence on the basis of which it had initially determined to award benefits. **Third**,...one of the doctors on whom Reliance Standard relied was not a cardiologist but a pulmonologist,[36] and he found Pinto's condition satisfactory only from his

---

[35] In the instant case, Reliance reversed its decision after more than a year of paying benefits (RSL 67).

[36] The difference between "a cardiologist and a pulmonologist" is indeed significant, yet said specialties are still intimately related. Consider, however, the <u>vast</u> difference between – for instance – such totally unrelated specialties as "a gastroenterologist [RSL 280] and a neurosurgeon" (as in Orr's case).

24

(pulmonary) vantage point, whereas the disability dispute is over a condition that is cardiological in nature... (Id., at 379) (Emphasis supplied.)

For these reasons, a factfinder could conclude that Reliance Standard's decision to credit its doctors...**was the result of self-dealing instead of the result of a trustee exercising its fiduciary duties** to grant Pinto the benefits due her under the insurance plan. (Id., at 394) (Emphasis supplied.)

### D. Bad Faith

The following excerpt, from yet another case with striking parallels to Orr's, serves to underscore the issue of Reliance's bad faith.

In view of my conclusion that its <u>unprincipled</u>, if not <u>fraudulent</u>, deliberative process fatally undermines Unum's contention that its decision to terminate Watson's eligibility for disability benefits was not an abuse of discretion, I need not determine whether "substantial evidence" supports Unum's decision to terminate benefits. If pressed to determine that question, however, I would conclude that Unum's clearly erroneous finding...**coupled with its failure <u>under the circumstances</u> to obtain an independent medical examination of Watson [as in Orr's case], in light of the conflict of interest [as in Orr's case]** under which it conducted its in-house review, so undermined the soundness of its determination that its determination cannot withstand even a "deferential "substantial evidence" review...

There is simply no basis, beyond Unum's in-house reviewers' *ipse dixit* conclusions that (1) the job of a legal secretary is "sedentary" **[incorrect DOT, as in Orr's case, on RSL 237],**[37] **and based further**

---

[37] Given the tandem mention of DOT parameters and hands-on examinations in this particular case, a related example, from a Reliance case, is therefore appropriate (Lasser v. Reliance Standard Life Insurance Company, 344 F.3d 381 (3rd Cir. 2003), with the first three excerpts below coming from one of the District Court's opinions (130 F.Supp.2d 616 (D. NJ 2001)):

No pre-existing term of the art accurately describes the amount of scrutiny with which the Court would examine the administrator's decision in this case...(Lasser, 130 F.Supp.2d at 625)

25

**on their highly selective reliance on incomplete medical records [as in Orr's case, on RSL 280 – 285, et al]...** (Watson v. Unum, 185 F.Supp.2d 579, 587 (Dist. MD 2002) (Emphasis and underlining provided.)

If Reliance had chosen to conduct a good faith review of Orr's multiple injuries and multiple disabilities (please see Exhibit R; 147 diagnoses), then it would have been more than happy to conduct one or more IME's when enough of the patient was still left to examine. There was simply no excuse for not examining the patient in the past, but this is no reason to punish Orr later on. Especially not now, when he is so helpless. By no means whatsoever does Reliance's bad faith omission of an essential examination in the past, justify the present and future threat to Mr. Orr.

Furthermore, the very idea of making such a request,[38] which represents nothing less than openly making a threat of irreparable harm, is reprehensible to the point of bad faith and beyond. For instance, most instances of bad faith – no matter how

---

An insistence on more evidence in the face of medical opinion favoring the beneficiary must at some point suggest that the insurer's conflict of interest has affected its benefits determination... (Id., at 623)

Rather than tackling the evidence frontally, Reliance attempts to redirect the argument toward the definition of Lasser's occupation... (Id., at 624)

Reliance commissioned a labor market survey (Lasser, 344 F.3d at 387)...Reliance's vendor sent 100 surveys to which it received fourteen responses, only nine of which were returned in time to be considered....**On the basis of the "survey" [which could easily be conducted to unequivocally show that a comatose patient could receive job offers in Hollywood; please see previous illustration in text], and on the absence of any affirmative showing [statistics] from Dr. Lasser...Reliance concluded that these duties were immaterial, precluding Dr. Lasser from disability benefits under the policy's terms. (Id., at 388 ; emphasis and quotation marks supplied.)**

The Court also added that the claimant was <u>not required to introduce evidence as to a numeric percent of probability of future harm</u>; instead a "medically unacceptable risk" constitutes appropriate evidence. (Lasser v. Reliance Standard Life Insurance Company, (146 F.Supp.2d 616, 629 (D. NJ 2001)).

[38] And/or refusing to waive the right to make such a request.

26

egregious[39] – do not involve direct threats to life and limb; nevertheless, Reliance Standard Life insurance Company has gone so far as to go a step further, and to make such a threat.

### E. Endangerment of Life and Limb

There are different types of bad faith, and also different degrees thereof. Most instances encountered by the Courts involve egregious conduct limited to "matters of paper," in other words, limited to a two-dimensional plane. Threats to life and limb are relatively rare – although given the 19,200 ERISA cases that have been tried over the years, there have been more than 170 such cases – but when such threats occur, they represent more than "two-dimensional threats," and present evidence that might satisfy the Court that the insurer has administered the claim "as an adversary…oblivious to [its] fiduciary obligations as administrator of the claim." Friedrich v. Intel Corporation, 181 F.3d 1105, 1110 (9th Cir. 1999)

### III.  CLOSING LEGAL ARGUMENTS

### A. A Question of Fact

A finding of permanent and total disability is a question of fact, not ERISA law:

> **The dispositive issue is "not really the interpretation of the [ERISA plan], but rather a question of fact: whether [plaintiff] was totally and permanently disabled from any kind of work."** Delaney v. Union Carbide Corp., 749 F.2d 17, 19 (8th Cir. 1984)...

---

[39] Dozens of instances have been described in previous sections of this Memorandum.

27

(In Wilcott v. Matlack, Inc., 64 F.3d 1458, 1461-1462 (10th Cir. 1995). (Emphasis supplied.) (See also Williams v. International Paper, 227 F.3d 706, 714 (6th Cir. 2000); Deegan v. Continental Casualty, 167 F.3d 502, 508-509 (9th Cir. 1999))

As shown below, six independent physicians have documented that Mr. Orr is totally and permanently disabled:

1.  Dr. Eric Woodard (Exhibit B)
2.  Dr. Mary Guerrera (Exhibit J)
3.  Dr. David Katz (Exhibit N)
4.  Dr. Adam Perrin (Exhibit 0)
5.  Dr. John Cannon (Exhibit P)
6.  Dr. Robban Sica (Exhibit Q)

It is therefore a fact that Orr is totally and permanently disabled.

## B. Clear Authority under ERISA § 502 (a) (3)[40]

As already summarized in State of Connecticut v. Physicians Health Services of Connecticut, Inc., the Appellate Court commented, in no uncertain words, about the significance of § 1132 (a) (3) as a safety net, citing precedential Second Circuit authority, along with a concurring Supreme Court case. Once again, the Plaintiff respectfully submits that, owing to the unique and exigent circumstances of this case, the aforementioned "safety net" should be employed to protect Orr from harm.

---

[40] And under Supreme Court rulings (Varity, Great-West, et al)

### 1. Precedence Over Any Possible Arguments of "Exhaustion," "Preemption," etc.

As the remedies requested are equitable in nature, provided for by statute, reinforced by case law, and fully available to individuals in Orr's position, there exists no question that the Plaintiff is entitled to relief. No possible arguments of "exhaustion," "preemption," and related apply.

Furthermore, even if one were to attempt to argue that the latter might apply, then such arguments would have no merit. First of all, the threat of irreparable harm takes complete precedence.[41]

In addition to the aforementioned support for Orr's position, it is crucial to mention the following point: The Reliance policy is written in such a manner **as to clearly fall within the definition of a de novo policy;** this inescapable fact – in conjunction with the threat of irreparable harm, and all of the other

---

[41] Relief is not only statutorily available and fully supported by precedent, but it is also explicitly provided that "**a claimant is excused from exhaustion** if: (1) threatened with irreparable harm; (2) denied meaningful access to the plan's administrative procedures; or (3) exhaustion would be futile. See, e.g, Berger, 911 F 2.d at 916 (finding exhaustion not required when futile); Kimble v. International Bhd. Of Teamsters, 826 F. Supp. 945, 947 (E.D. Pa 1993)...Lucas Warner & Swasey Co., 475 F. Supp. 1071, 1074 (E.D. PA.) 1979) (excusing claimant from exhaustion if threatened with irreparable harm or denied meaningful access to plan's administrative procedures)." In Wogman v. Teamsters Health and Welfare, 1998 WL 461841 at 2 (E.D. PA August 6, 1998). (Emphasis supplied.)  See also Henderson v. Bodine Aluminum, Inc., 70 F3d 958, 962 (8th Cir. 1995), confirming that exhaustion of remedies simply does not apply when the threat of irreparable harm exists.

In addition, it is important to note the following: "[The] Summary Plan Description defines a claim as '[a]ny request for benefits under a health care Benefit Program made in accordance with the Benefit Program's claims filing procedures...'...A claim is thus defined as request for benefits...[in Reliance's policy, on Page 2.0, the definition of "Claimant" is as follows: "[A]n Insured who makes a claim for benefits..."] Bish v. Aquarion Services, 289 F.Supp.2d 134, 150 (D. Conn. 2003). Accordingly, the contract provides no equitable remedies such as those requested by Orr, and necessitated by unique and exigent circumstances.

29

factors discussed herein – results in a unique situation in which the Courts can fully exercise their powers to serve as substitute administrators.[42]

## 2. Three Cases: Darland, Hall, and Kinstler

In Darland v. Fortis Benefits, 317 F.3d 516, 533-534 (6th Cir. 2003), at page 17, the Court unequivocally ordered the insurer **"to continue the payment of LTD benefits to Darland"** (Emphasis supplied), who was totally and permanently disabled. Furthermore, the Court severely chastised the insurer for ignoring the Social Security Determination:

> [I]t is plainly evident that the Social Security standard for a disability determination is much more stringent than that required by Fortis' insurance policy [Compare to Orr.] (Id., at 530)

---

[42] Furthermore, in Davenport v. Harry N. Abrams, Inc., 249 F.3d 130, 133 (2nd Cir. 2001), a case which did not even involve unique and exigent circumstances, the Court commented as follows: "'The primary purposes of the exhaustion requirement are...(3) **[to] assure that any judicial review is made under the arbitrary and capricious standard, not de novo.'** Kennedy v. Empire Blue Cross & Blue Shield, 989 F.2d 588, 594 (2nd Cir. 1993)..."

As the Reliance policy in the instant case does not fall under the "arbitrary and capricious standard," the above is highly instructive, especially in light of dispensing with inapposite cases such as Peterson v. Continental Casualty Company, 282 F.3d 112, 123 (2nd Cir. 2002) in which, for instance, under the arbitrary and capricious standard, the Court chose not to adjudicate the question of Peterson's eligibility for permanent long-term disability benefits prior to a determination by the plan administrator on that issue, at Page 1. Since the policy in Orr's case bears no resemblance to that in Peterson (and also since there exists threat of irreparable harm), then inherently more flexibility is granted to the Court, even though Orr is not even requesting that the Court "pre-adjudicate" and/or "pre-award" benefits. Once again, only equitable relief has been requested by Orr.

It is also notable that, as mentioned before, the Kinstler Court (in regard to the issue of continued jurisdiction), even in dealing with such an "innocuous" injury as a bad knee – which did not even result in a preclusion of sedentary activities – fully chose to exercise its power as substitute administrator, with retention of jurisdiction for review of any subsequent adverse determination.

30

In yet another case, Hall v. Unum, 300 F.3d 1197, 1199-1200 (10th Cir. 2002), the Plaintiff was also awarded injunctive relief for future benefits; nevertheless, she died during the appeal, which was highly unfortunate. This was described in the case law included in the Plaintiff's letter of December 12, 2003, and is re-mentioned here for the following reason: The relief requested by Orr includes neither a request for "ninety days notice before benefits can be terminated," nor a request for continued payment, etc. Why not? What about Mr. Darland and Ms. Hall? Didn't they ask for and receive <u>more</u> relief that Orr has requested? Yes, they did.

So why hasn't Orr asked for more? The answer to this question is quite simple, is described in more detail in the next section, and primarily has to do with protecting Orr during the appeal process.[43]

---

[43] As the insurer has already communicated its intent to appeal, the statement above is not meant to imply that there will be no possibility for an appeal to be filed. However, given the fact that absolutely no new case law would be made if injunctive relief were granted (this is even overtly stated so, in <u>Zervos Zervos v. Verizon New York, Inc.</u>, 277 F.3d 635, 658 (2d Cir. 2002), for instance), then the risk to Orr, during any possible appeal, is completely minimized.

As in certain other "appeals" that have been brought by Reliance (<u>including a relatively recent Second Circuit appeal that will be discussed shortly</u>), the Appeals Courts generally dispense with routine ERISA matters rather rapidly, in that nothing more than a brief Summary Order, upholding the actions of the District Court, ever appears. Once again, given the fact that absolutely no new case law would be made in the possible granting of Orr's request for the protection of the Court, the risk to Orr is minimized.

Nevertheless, even if the "risk of appeal" were NOT minimized, then Orr would still proceed. Why? **Because the alternative – the risk of injury, and possibly even death – poses a wholly unacceptable risk. Also, even <u>if</u> Orr were to escape immediate bodily harm from examinations and related, then there still remains the very real issue of the bodily harm he might suffer from a prolonged discontinuance of benefits. Orr is helpless. He depends on his benefits <u>for the basic needs of survival</u>.**

As one might imagine, his healthcare insurer fights him tooth and nail for each and every expense, and sometimes refuses to cover essential treatment. More importantly, the insurer often sets "caps and limits," and of course Orr has already exceeded such caps and limits. <u>This means that Orr must pay for life-essential treatment from his LTD checks</u> – from Reliance. (See, for instance, <u>United Steelworkers of America, AFL-CIO, et al v. Fort Pitt Steel</u>, 598 F.2d 1273, 1280 (3rd Cir. 1979), in which the possibility that

And now a final word about <u>Kinstler</u>: Here we have a precedential case in the Second Circuit, against the same Defendant, and employing the same policy. There are differences, though. Ms. Kinstler had a bad knee, and Mr. Orr has SCI. If Ms. Kinstler received the benefit of the continued protection of the Court (and she did receive it). Orr's case is more deserving.

## C. <u>No New Precedent (Zervos)</u>

Judge Dennis Jacobs authored an eloquent ten-page dissent in <u>Zervos</u>, in which he – interestingly enough, and in a rather paradoxical manner – made several excellent points in support of the unassailability of any ruling made in favor of Orr:

> Fortunately the majority opinion casts its ruling [granting injunctive relief] in terms of the "exigent and unique circumstances of this case," *majority op.* at 16, a limitation that invites fact-based distinctions in any subsequent case, however similar. **In short, the majority opinion has not altered the law of this Circuit in any fashion.** <u>Zervos v. Verizon New York, Inc.</u>, 277 F.3d 635, 658 (2d Cir. 2002) (Emphasis supplied.)

---

a worker would be denied adequate medical care would constitute substantial and irreparable injury. See also *Watts v. Organogenesis*, 30 F. Supp. 2d 101, 104 (D. Mass. 1998) the Court also excused exhaustion where the claimant faced irreparable harm.

Obviously, the above discussion of loss of income is entirely germane to our present discussion, as it clarifies yet additional threats encountered by Orr. An individual with SCI has special expenses – directly related to his survival – and has every right to expect that he will <u>not</u> be placed in harm's way by the loss of his disability benefits, upon which he depends for his very survival.

Orr respectfully submits that the fact-based distinctions in his case empower the Court to exercise its full discretion in the granting of permanent injunctive relief, without setting any new precedent whatsoever.

## IV.   <u>CONCLUSION</u>

> The policy expressed in <u>Perry</u> that district courts should not become "substitute plan administrators" is inappropriate where such a blatant conflict exists at the administrative level.  **In such circumstances, courts <u>must</u> exercise fully their power to review <u>de novo</u> and to <u>be</u> substitute administrators.**
>
> **Plaintiffs are utterly helpless against the whim of the conflicted body's interpretation of the facts.**
>
> <u>DeFelice v. American International Life Assurance Co.</u>, 112 F.3d 61, 66 (2d Cir. 1997) (All underlining in original text; emphasis and division of final paragraph supplied.)

The relief requested by multiple physicians is reasonable in nature and cannot be characterized as "overstepping the line." It is only natural that a claimant with SCI – and with such multitudinous injuries – should be protected. The limits of equitable relief under ERISA are broad in nature, and encompass a wide variety of remedies, and if Orr had been "greedy," perhaps he would have gone a step further and requested – as Mr. John Dishman[44] did in a case against Unum – a permanent injunction "against [ever]

---

[44] In excess of six opinions have apparently been written in this case, including multiple appeals, and ranging from <u>Dishman v. UNUM Life Insurance Company</u>, 1997 WL 906146 (C.D. Cal. May 9, 1997) (with the above excerpt from Page 11, and from the Complaint) to <u>Dishman v. UNUM Life Insurance Company</u>, 269 F.3d 974 (9th Cir. 2001), et al.

In the latter appellate level opinion, the Court took the opportunity to condemn numerous practices integrally related to – for instance – Reliance's insistence that it has the "right" to engage in actions that threaten Orr, all because the insurer insists that ERISA provides it with that "right." And although certain

discontinuing future disability payments," a highly unusual remedy. Part of the litigation in Dishman is apparently still ongoing, but the Court has granted his request.

One of the many judges in the case even went so far as to comment that "UNUM was not motivated by a legitimate purpose,"[45] a conclusion that would be entirely consistent with a depiction of Reliance's behavior in the instant case.

However, in the opinion of the undersigned, Dishman asked for too much, at least under the present confines of ERISA law, for his request for injunctive relief clearly

---

portions of Dishman may possibly be appealable, **absolutely no one has ever challenged (nor could anyone challenge) – in any way whatsoever – the Court's following condemnation of threat to life and limb, which is very important to upholding the logic of Orr v. Reliance:**

> If that were the case, a plan administrator [or fiduciary, et al] could "investigate" [and/or perform other "contractually allowable actions," such as tests, examinations, interviews, rehabilitative employment, requesting additional "proof," et al – even though all such actions have been deemed harmful to Orr's health] a claim in **all sorts of tortious ways** with impunity.
>
> What if one of UNUM's investigators had accidentally rear-ended Dishman's car while surveiling [sic] him? [What if one of Reliance's examinations resulted in severing Orr's spinal cord completely?]
>
> Would the fact that surveillance was intended to shed light on his claim shield UNUM and the investigator from liability? [Would the fact that the tests, examinations, interviews, rehabilitative employment, additional "proof," et al, were intended to shed light on Orr's claim shield Reliance Standard Life Insurance Company from liability for the harm done by such tests, examinations, interviews, rehabilitative employment, additional "proof," et al?]
>
> ...Must that be tolerated simply because it is done purportedly in furtherance of plan administration? To ask the question is to answer it. Dishman v. UNUM Life Insurance Company, 269 F.3d 974, 984 (9th Cir. 2001) (Emphasis supplied)

[45] Dishman v. UNUM Life Insurance Company, 269 F.3d 974, 987 (9th Cir. 2001)

34

involved remedies outside the normal realm of equity.[46] Not so with Orr, though, as the remedies requested are more than reasonable – and furthermore have been requested under circumstances that are infinitely more unique and exigent than Dishman's (whose disability was migraine headaches).

Orr's case is "the classic textbook case" of a situation where the full gamut of equitable remedies is called for. <u>Multiple</u> threats of irreparable harm exist, and more than two-dimensional paper is at stake. Reliance's past conduct can only be characterized as egregious, and its present conduct is even more so.

Reliance's conduct should be measured against <u>the objective standards</u> established by ERISA – standards designed to "eliminate any 'empty-head pure-heart' justification[s]" and/or "patently frivolous arguments."[47] Furthermore, as shown below, ERISA law is certainly not immune to the application of precisely the same standards enumerated in the <u>Pennie & Edmonds</u> Dissent:

> "[T]his is not a search for subjective good faith – **a pure heart and an empty head are not enough**." <u>Donovan v. Cunningham</u>, 716 F.2d 1455, 1467 (5th Cir. 1983). ERISA's prudent person standard is objective, focusing on the conduct of a particular fiduciary. In other words, whether any given fiduciary acted prudently is **a question of fact**, and this case presents no exception to the general rule.

---

[46] Although perhaps an individual suffering from Orr's particular SCI disabilities could indeed make an unassailable argument for such relief (outside the "normal" realm of equity), owing to the special circumstances involved with his state of helplessness.

[47] <u>In re Pennie & Edmonds LLP</u> (Appellant), 323 F.3d 86, 99 (2nd Cir. 2003) [Vacating 18 Law. Man. Prof. Conduct 52], Dissent, Honorable Stefan R. Underhill. Please note that the standards discussed and developed therein are equally applicable in numerous arenas, including ERISA, as plainly shown in <u>Donovan v. Cunningham</u>, 716 F.2d 1455, 1467 (5th Cir. 1983), a case which will be introduced in just a moment.

<u>Keach v. U.S. Trust Company, N.A.</u>, F.Supp.2d 840, 845 (C.D. IL 2002)
(Emphasis and underlining supplied.)[48]

There is no justification for Reliance's behavior, past or present. Its actions can be judged by objective standards, and the determination of its bad faith is <u>a question of fact</u>. Orr respectfully submits that the Court is entitled to make this determination, and to grant relief against an insurer that has plainly stepped over the line.

There is absolutely no way to characterize its threat to an invalid as anything but reprehensible. Accordingly, Orr respectfully requests the protection of the Court in granting his request for Permanent Injunctive Relief against Reliance Standard Life Insurance Company.

---

[48] As described previously, "[a] fiduciary with a conflict of interest must act as if he is "free" of such a conflict. <u>Doe</u> 3 F.3d at 87. 'Free' is an absolute. **THERE IS <u>NO</u> BALANCING OF INTERESTS; ERISA COMMANDS UNDIVIDED LOYALTY TO THE PLAN PARTICIPANTS.**" <u>Bedrick v. Travelers Insurance Company</u>, 93 F.3d 149, 154 (4th Cir. 1996) (Emphasis, capitalization, and underlining supplied)

This is reemphasized for a very simple reason: It is anticipated that Reliance may attempt to recycle an argument that it has often employed, in numerous ERISA cases, namely, an argument that <u>if</u> Reliance is ever inescapably termed a "fiduciary," then its true loyalty lies in "keeping costs low for the Plan as a whole," <u>and that such an "overriding goal" is clearly prohibitive of the cognizance of the individual needs of individual participants</u>. Of course, such arguments are generally couched in terms of a "balance of interest." Nevertheless, as has been described above (<u>Bedrick v. Travelers</u>), such arguments lack merit, both statutorily and in the relevant case law.

Also, in regard to relevant case law, please note that oftentimes the word "fiduciary" assumes a special (and rather confusing) role in certain ERISA settings involving retirement plan assets, ESOP assets, and related. <u>This is very important to mention</u>, for the following reason: The duties of such "fiduciaries" can be substantially different from the duties of LTD Plan Fiduciaries (such as Reliance), as the <u>former</u> are generally held responsible to "the plan as a whole" since they are basically little more than investment bankers (<u>no</u> contact with any individual members at all) who are responsible for attaining certain ROR (rates of return). In such plans, tens of billions of dollars of assets are often at stake, hence the development of substantial case law concerning such "fiduciaries," who are obviously somewhat different from ERISA players like Reliance.

Regardless of what type of fiduciary one may be discussing, however, there exist objective standards for the determination of actions constituting bad faith and/or breach of fiduciary duty. Dozens of infractions have been discussed herein, with numerous of them having been of the type <u>formally condemned by the Courts as indicative of either bad faith or a breach of fiduciary duty</u>.

36

V.   **LIST OF EXHIBITS**[49]

    A.    Social Security Award

    B.    Total Disability Assessment (Dr. Eric Woodard)

    C.    Dr. Mary Guerrera's File Shipment (>250 pages)

    D.    The Timeline (and Dr. Guerrera's Form 14B Records)

    E.    Reliance's Missing Invoice (for a missing portion of the claim file), plus Orr's Proof of Payment (canceled check) for a portion of the claim file that is missing

    F.    Example Missing Letters (five sent from Reliance, and three sent to Reliance)

    G.    Three "Statements of Disability and Undue Burden" (Form 127T), as submitted by three independent physicians (Dr. Mary Guerrera, Dr. Adam Perrin, and Dr. Mark Warner)

    H.    Form 971, as completed by Dr. Adam Perrin

    I.    Missing Chart Portion (plus forty-nine additional missing pages)

    J.    Affidavit of Total and Permanent Disability, Dr. Mary Guerrera (plus reconfirmation of file shipment [>250 pages])

    K.    (Reserved)

    L.    (Reserved)

    M.    (Reserved)

---

[49] Please note that the "thumbnail descriptors" employed in this list are not meant to substitute for the full exhibit descriptions contained in the various briefs, letters, and original document sources in which the exhibits are referenced.

N. Statement of Total Disability and the Threat of Harm from Tests, Examinations, Interviews, Rehabilitative Employment, etc. (Dr. David Katz)

O. Statement of Total Disability and the Threat of Harm from Tests, Examinations, Interviews, Rehabilitative Employment, etc. (Dr. Adam Perrin)

P. Statement of Total Disability and the Threat of Harm from Tests, Examinations, Interviews, Rehabilitative Employment, etc. (Dr. John Cannon)

Q. Statement of Total Disability and the Threat of Harm from Tests, Examinations, Interviews, Rehabilitative Employment, etc. (Dr. Robban Sica)

R. Diagnoses and Conditions, Dr. Eric Woodard

S. (Reserved)

T. Four thousand four hundred-plus pages (4,400+) pages of medical records

U. Very early document (1996) indicating major testing restrictions

V. Letter of September 6, 2001, indicating the following: "All testing that can be done has been completed..."

W. Power of Attorney Form, signed by the patient's wife

X. Letter of December 23, 2003, from Reliance, indicating "non-waival" of its rights to make certain demands and/or to carry out various actions that constitute a documented threat of irreparable harm.

Y.  <u>Kinstler</u>, Second Amended Opinion, indicating continued jurisdiction of the Court "for subsequent review of any further adverse determination"

Z.  Letter of September 18, 2001, indicating the paradox of the patient's current condition (over-tested, over-evaluated, etc.) being a direct result of earlier "under-treatment"

AA. <u>Kinstler</u>; Index to the *Defendant-Appellant's Appendix,* indicating that the first page of the Reliance policy (identical to Orr's policy in all material aspects) begins on "Appendix Page 'A346'"

BB. <u>Kinstler</u>; the Reliance Policy (identical to Orr's in all material aspects)[50]

CC. Dr. Eric J. Woodard, Abbreviated Curriculum Vitae (Harvard)

DD. Dr. Peter M. Black, Abbreviated Curriculum Vitae (Harvard)

EE. Dr. David L. Katz, Yale IMC Director (Abbreviated Qualifications)

FF. Dr. David L. Katz, Abbreviated Curriculum Vitae (Yale)

GG. Dr. David L. Katz, *Clinical Epidemiology and Evidence-Based Medicine* (textbook; one of seven)

---

[50] Please note that the first page of Reliance's Policy (in the <u>Kinstler</u> Appendix) was preceded by a tab denoting it as "Exhibit B," even though it appears in the above list as "Exhibit BB." The former tab was, of course, the one previously used in the appellate case.

39

SHEFFY & MAZZACCARO, LLP

BY: _____
A. ALAN SHEFFY
35 North Main Street
Southington, CT 06489
Telephone: (860) 620-9460
Facsimile: (860) 620-9348
ID# CT04366
Attorneys for:
Plaintiff, Edward W. Orr

## CERTIFICATE OF SERVICE

I hereby certify that I have served a true and correct copy of the foregoing upon counsel of record this date by United States Postal Service first class mail, postage pre-paid, addressed as follows:

Gary N. Stewart
Rawle & Henderson
25 North Front Street
Harrisburg, PA 17101

_____
A. Alan Sheffy